```
 1        IN THE UNITED STATES DISTRICT COURT FOR THE

 2              NORTHERN DISTRICT OF TEXAS
                     DALLAS DIVISION
 3
   OTIS DAVIS, DOROTHY O. JACKSON,)
 4 and LASANDA TRAVIS-DAVIS,      )
   Individually and as the       )
 5 Administrator of the Estate of )
   Decedent, Bertrand Syjuan Davis)
 6                                )
                   Plaintiffs,    )
 7 vs.                            )Case No. 3:16-CV-2548-L
                                  )
 8 MATTHEW TERRY,                 )
                                  )
 9                 Defendant.     )
10      ----------------------------------------

11           REPORTER'S TRANSCRIPT OF PROCEEDINGS
             HAD ON THURSDAY, MARCH 3, 2022
12
        TESTIMONY OF LUCAS FLORES, III (JURY TRIAL)
13
    BEFORE THE HONORABLE SAM A. LINDSAY, JUDGE PRESIDING
14            A P P E A R A N C E S

15 MR. DARYL K. WASHINGTON
   Washington Law Firm PC
16 325 N. St Paul Street, Suite 3950
   Dallas, TX 75201
17 214-880-4883
   dwashington@dwashlawfirm.com
18
   MR. JAMES GREGORY MARKS
19 Slack Davis Sanger LLP
   12221 Merit Drive, Suite 945
20 Dallas, TX 75251
   972-774-9800
21 gmarks@slackdavis.com

22 MR. THAD D. SPALDING
   Durham, Pittard & Spalding, LLP
23 PO Box 224626
   Dallas, TX 75222
24 214-946-8000
   tspalding@dpslawgroup.com
25
   COUNSEL FOR THE PLAINTIFFS
```

```
1   APPEARANCES CONTINUED -

2   MR. THOMAS P. BRANDT
    MR. STEPHEN D. HENNINGER
3   MR. CHRISTOPHER THOMAS BRANDT
    Fanning Harper Martinson Brandt & Kutchin PC
4   Two Energy Square
    4849 Greenville Avenue, Suite 1300
5   Dallas, TX 75206
    214-369-1300
6   tbrandt@fhmbk.com, shenninger@fhmbk.com,
    cbrandt@fhmbk.com
7

8   COUNSEL FOR THE DEFENDANT

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                     I    N    D    E    X
```

```
 2                                            VOLUME   PAGE

 3   WITNESS:

 4   LUCAS FLORES
     Direct Examination (By Mr. Marks)           I        4
 5   Cross-Examination (By Mr. Brandt)           I       33
     Redirect Examination (By Mr. Marks)         I       37
 6   Excused                                     I       37

 7

 8
     REPORTER'S CERTIFICATE                      I       38
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1      (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

2   WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

3   PRESENCE AND HEARING OF THE JURY.)

4          THE COURT: Will the Plaintiffs call their next

5   witness.

6          MR. MARKS: Thank you, Your Honor, at this time

7   we would call Officer Lucas Flores.

8          THE COURT: Remember what I said about changing

9   the mike covers.  Has that been done?

10         MR. MARKS:  We did it at the break, but to be

11  honest, Your Honor, I forgot to do it between the other

12  two witnesses.  I then remembered, and we did it.

13         THE COURT: Okay.

14      All right, sir, raise your right hand.

15                       LUCAS FLORES,

16  having been first duly sworn to tell the truth-the whole

17  truth, and nothing but the truth, testified as follows:.

18         THE COURT: You may be seated and you may remove

19  your mask.  You may proceed, Mr. Marks.

20         MR. MARKS:  Thank you, Your Honor.

21          D I R E C T    E X A M I N A T I O N

22  Q.  (BY MR. MARKS) Officer Flores, can you please tell

23  the jury your full name.

24  A.  My name is Lucas Flores, III, Senior Corporal, Dallas

25  Police Department.

1  Q.  You may need to either move the microphone a little

2  bit so not only the jury can hear you, but the court

3  reporter can hear you.

4  A.  I am sorry.  Yes.

5  Q.  And, Officer Flores, you are a police officer with

6  the Dallas Police Department?

7  A.  Yes, sir.

8  Q.  How long have you been a police officer with the

9  Dallas Police Department?

10  A.  Now, 33 years.

11  Q.  Are you close to retirement?

12  A.  I am broke still.  I've got to stay.

13  Q.  All right.  Sorry.  Your current rank is what?

14  A.  Senior Corporal.

15  Q.  Is it okay -- with all due respect, I would like to

16  call you Senior Corporal Flores, but it is kind of

17  mouthful.  Is Officer Flores okay?

18  A.  You can call me Flores.

19        THE COURT: We will have some formality.  We are

20  not going to call you Flores.

21        THE WITNESS: I am sorry.

22  Q.  (BY MR. MARKS) Is it okay if I call you Officer

23  Flores?

24  A.  Yes, sir.

25  Q.  So the jury understands, you are a senior corporal

1  officer?

2  A.   Yes, sir, Senior Corporal Lucas Flores, III.

3  Q.   What are your duties?

4  A.   Right now patrol officer.  Normally, I am training.

5  I have not had a rookie in the past two months, so my

6  duties right now are regular patrol officer.

7  Q.   Is there a certain beat that you patrol?

8  A.   I am assigned to beat 347; however, the way it works

9  is we have to go over the calls which means we've got

10  Pleasant Grove, way south up to Fair Park, south Dallas,

11  and areas in between.

12  Q.   In August -- in oh -- on August 27, 2015, were you

13  patrolling the same general area?

14  A.   Same area, always, yes.

15  Q.   Okay, so for your 33 and whatever time frame, has it

16  been pretty much the same area that you have patrolled?

17  A.   Yes, the beats and the assignments will change every

18  three or four years or something like that, but none of

19  that matters, I am either Pleasant Grove or if it happens

20  to south Dallas, I get shipped to south Dallas, northern

21  Pleasant Grove.  I go where the calls are which means

22  Pleasant Grove to Dallas all day back and forth.

23  Q.   Have you done anything to prepare for your testimony

24  here today?

25  A.   I have tried to read a statement.  You have to

1  understand it causes pain to read it, so I tried to read

2  a statement.

3  Q.  You are talking about the statement that you gave?

4  A.  Yes.

5  Q.  September 1, 2015?

6  A.  Whatever the date is.  I don't know.  September,

7  2015, yes.

8  Q.  Have you met with anyone to talk about your -- to

9  prepare yourself for the testimony here today?

10  A.  Back in November, the City's attorneys called me in

11  and what, last week or so, I talked to the attorneys

12  again; right, yeah.

13  Q.  One of the attorneys over here at the defense table?

14  A.  Yes.

15  Q.  Do you recall which one you talked to?

16  A.  No.  I try not to think about it.

17  Q.  How long did you talk to them?

18  A.  I don't know, 30 minutes, an hour, 30 minutes, an

19  hour, I don't know.

20  Q.  Do you recall what you talked about?

21  A.  The incident.  They asked me to talk to them about

22  what I remembered.

23  Q.  Okay.  Did they -- did they give you an idea of what

24  kind of questions may be asked of you here today?

25  A.  I am sure they did.  I don't remember.  It is just

1  emotional.  I don't remember.

2  Q.  Fair enough.  Fair enough.  Have you talked about the

3  incident with anyone else other than attorneys?

4  A.  My wife.  I think in the past, I have discussed it

5  with an officer or two.  I never discussed it with the

6  officers that were out there the scene.

7  Q.  What officers do you think you discussed it with?

8  A.  I don't remember.  Stuff like that just goes out of

9  my mind.

10  Q.  But let me ask you this.  Other than Officer Rice,

11  who you were training; is that right?

12  A.  Yes, sir.

13  Q.  Did you know any of the officers that were dealing

14  with Mr. Davis on that day?

15  A.  Okay, the one officer I saw yesterday, I am familiar

16  with him.

17  Q.  And who is that?

18  A.  He left southeast a while back.  I have forgotten his

19  name.  Joseph.

20  Q.  Officer Joseph?

21  A.  Yes.

22  Q.  Anyone else?

23  A.  No, not from the scene.  I don't remember, uh-uh.

24  Q.  Let me ask you this.  Do you know Officer -- did you

25  know Officer Terry?

1  A.  I had seen him before.  We don't work in the same

2  area.  I don't know him.  I think we answered a call

3  together in --what was it fall, something like that, but

4  he works in a different part of town, so I don't talk to

5  him really.

6  Q.  Did you know him from his union activities?

7  A.  I didn't know he had union activities.

8  Q.  How about Officer Neal?  Did you know Officer Neal?

9  A.  If I saw his face perhaps, but not by name.

10 Q.  How about Officer King?

11 A.  If I saw his face perhaps, but I don't know his name.

12 Q.  Officer Rory Jones?

13 A.  Yes, he is at southeast with me.  I know him.

14 Q.  And you didn't talk to any of those about the

15 incident?

16 A.  No.

17 Q.  At any time?

18 A.  No.

19 Q.  All right.  All right, let's talk about the day of

20 the accident or incident, if we can, okay.  When you get

21 out of the car, the patrol car with Officer Rice, did you

22 have your gun drawn?

23 A.  No.

24 Q.  Did you draw your gun at any time during the two

25 minutes that you were dealing with Mr. Davis, and the two

1  minutes I am referring to is when you and Officer Rice

2  arrived at the scene and from -- until the time of the

3  shooting, did you ever draw your weapon?

4  A.  No.

5  Q.  I assume you didn't draw your weapon because you

6  didn't think --

7      THE COURT: Let's rephrase the question, "I

8  assume."

9      MR. MARKS: All right.  I will rephrase the

10 question.  Thank you, Your Honor.

11 Q.  (BY MR. MARKS) At any time during the little less

12 than two minutes that you were dealing with Mr. Davis

13 before the shooting, did you ever feel like you were in

14 imminent threat of serious bodily injury or death?

15 A.  You said at any time, so yes.

16 Q.  When did you fear -- when you fear that you were in

17 imminent bodily injury or death?

18 A.  That's when I looked up.  Can I tell the story?  I am

19 standing there in the doorway of the car.  I am right

20 there at the door.

21      THE COURT: What you need to do, as I said

22 before, Mr. Marks, let's do this by question and answer

23 and not have a narrative.

24      MR. MARKS: Fair enough.

25      THE COURT: I would tell Counsel on both sides to

1  be mindful what the Court said about asking questions.

2  Let's do it in question and answer, no narrative.

3       MR. MARKS: All right, I will, Your Honor.

4  Q.  (BY MR. MARKS) Let me ask it this way.  At any time

5  during the less than two minutes that you were with

6  Mr. Davis, did you ever see him produce a gun?

7  A.  No, sir.

8  Q.  Did you ever see him produce a knife or any other

9  weapon?

10 A.  No, sir.

11 Q.  All right, when you arrive at the scene, where is

12 Mr. Davis located?

13 A.  Now, according to the statement he was up there ahead

14 of us beside a car.  I don't remember that.  It has been

15 years.  It's hard to remember, but according to my

16 statement that I wrote, I see him up by the car with

17 other officers.

18 Q.  All right, let me just say this.  I am just asking

19 you what you remember, and then if you need to be

20 refreshed by your statement or your memory refreshed by

21 your statement, we can do that.  But as you sit here

22 today, do you recall where he was located?

23 A.  I remember him and this story.  He is standing

24 outside the passenger door, sir, that is not correct.

25 Years ago when I wrote this, I first see him on the

1  driver's side outside the car door.  What do you want?

2  What I remember here is different from what I wrote down.

3  Q.  Fair enough.  But really.

4       THE COURT: Counsel approach the bench.

5  (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH, WITH

6  ALL COUNSEL PRESENT, AND OUT OF THE HEARING OF THE

7  JURY.).

8       THE COURT:  You need to take control of the

9  witness.  I do not know how to say it any other way.  You

10  need to take control of the witness.  You ask him

11  questions.  You are in charge.  The tail doesn't wag the

12  dog.  Right now, he is volunteering information.  You

13  just need to ask him questions, and if he doesn't know,

14  he doesn't know.

15       MR. MARKS: Okay.

16       THE COURT: I will tell you this, and I will tell

17  both sides.  The Court is not surprised by any of this

18  because of what the parties informed the Court.  I

19  believe that in an earlier pretrial conference, and he

20  needs to say exactly what he saw.  If he did not -- if

21  that statement -- if his statement is inconsistent with

22  what he says now, that is fair game for both sides.  But

23  the main thing is take charge of the witness.

24       MR. MARKS:  Okay, thank you.

25     (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

1  WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

2  PRESENCE AND HEARING OF THE JURY.)

3          THE COURT: One thing before we get started to

4  resume.

5      Senior Corporal Flores, let me say this.  When you

6  are asked a question, only answer the question asked and

7  do not volunteer information.  Once you answer the

8  question, wait for the next question asked by Mr. Marks.

9  All right, Mr. Marks, you may proceed.

10         MR. MARKS:  Thank you, Your Honor.

11 Q.  (BY MR. MARKS) Officer Flores, what I am wanting to

12 know is what your memory is, not what you wrote in your

13 statement; fair?

14 A.  Yes, sir; thank you.

15 Q.  And what is your memory as to where Mr. Davis was

16 when you first arrived at the scene?

17 A.  Standing outside the passenger car outside the car.

18 Q.  On the passenger side?

19 A.  Yes, sir.

20 Q.  Of the gray or silver SUV?

21 A.  Yes, sir.

22 Q.  Now, at some point shortly thereafter, does he come

23 around to the driver's side?

24 A.  Yes, sir.

25 Q.  Okay, when you approach the vehicle, was the driver's

1  side door open?

2  A.  I don't know if it was open or ajar.  I just remember

3  opening it wider.

4  Q.  When you say "opening wider," what do you mean?

5  A.  It's possible the door was partially opened.  I

6  remember myself opening it wider if not opening it

7  completely, but I had to push it wider to get in there.

8  Q.  To get into -- I am not asking about later on.  I am

9  asking about when you arrived at the scene, was the

10 driver's side door open?

11 A.  I don't remember that.

12 Q.  Okay, one way or the other?

13 A.  I don't remember if the car door was open when I

14 first arrived at the scene.

15 Q.  Now, what was Mr. Davis's -- what was your perception

16 of Mr. Davis's demeanor at that time?

17 A.  To me, he was behaving unreasonably when I first

18 noticed him in my memory.  He is behaving a bit jittery.

19 It is fuzzy, but that is what I remember.

20 Q.  All right, did he appear to be confused as why he was

21 being detained?

22 A.  Well, he wasn't behaving normally or reasonably, so

23 not normal.

24 Q.  Yes, sir, but my question is simple.

25 A.  Yes.

1  Q.  Did he appear to be confused as to why he was being

2  detained?

3  A.  I don't remember that.

4  Q.  Do you recall him saying, "Why are you detaining me;

5  why are you detaining me?"

6  A.  I don't remember that.

7  Q.  Now, shortly after getting to the scene, do you then

8  begin try to handcuff Mr. Davis?

9  A.  I don't remember that.

10  Q.  Do you recall trying to handcuff Mr. Davis at any

11  point in time?

12  A.  No, sir.

13          MR. MARKS: Your Honor, may I approach the

14  witness?

15          THE COURT: Well, for what purpose?

16          MR. MARKS: Okay, let me ask it this way.

17  Q.  (BY MR. MARKS) Do you recall giving a statement in

18  this case on September 1, 2015?

19  A.  Yes, I did.

20  Q.  Would that statement help you refresh your

21  recollection?

22  A.  Yes, sir.

23          MR. MARKS: Your Honor, may I approach the

24  witness?

25          THE COURT: You may.

1          MR. MARKS: Take your time.  Read the statement.

2   Don't read it out loud.  Read it to yourself, and I will

3   ask you after you refreshed your recollection, and I will

4   need to take the statement back.

5          (PAUSE IN PROCEEDINGS.)

6          THE WITNESS: Sir, I have read it.

7          MR. MARKS: All right, thank you. May I approach?

8          THE COURT: You may.

9   Q.  (BY MR. MARKS) Now -- now, do you recall at some

10  point in time after arriving at the scene you tried to

11  handcuff Mr. Davis?

12  A.  Yes, I tried to handcuff Mr. Davis.

13  Q.  And were there other officers helping you try to

14  handcuff him?

15  A.  Yes, there were other officers.

16  Q.  Do you know how many other officers?

17  A.  No.

18  Q.  Do you know -- any of the other officers that may

19  have been involved?

20  A.  No.

21  Q.  Explain to the jury what you did to try to handcuff

22  him the best you can recall?

23  A.  Okay.  I grabbed him, and he broke free.

24  Q.  Do you recall which arm or hand that you grabbed?

25  A.  No.

1  Q.  Do you recall -- do you recall seeing that one of his

2  hands was wrapped in a white cloth?

3  A.  Yes.

4  Q.  Do you recall which hand it was?

5  A.  No.

6  Q.  Now, after -- when he broke free from your grasp, did

7  you ever have a firm grasp on him?

8  A.  I don't remember how firm my grasp was.

9  Q.  Did you have both hands on him or just one hand?

10  A.  I don't remember if it was one or both hands, sir.

11  Q.  And then regardless, you do recall that he broke

12  away?

13  A.  Yes.

14  Q.  And then what happened after he broke away?  By the

15  way, when he broke away from your grasp, were there other

16  officers that still had a grasp on him?

17  A.  I don't know.

18  Q.  Tell me what you recall after he broke away.

19  A.  I wound up being on the passenger side outside of the

20  vehicle with him.

21  Q.  Was he ever tased?

22  A.  Yes.

23  Q.  When was he tased?

24  A.  I don't know the exact moment he was tased.

25  Q.  Was he tased shortly after -- getting out of your

1  grasp?

2  A.  I know I just read it.  I don't know if he was tased

3  before or after.

4  Q.  Do you think it is possible that he was tased before

5  you grabbed him?

6  A.  Anything is possible.  I don't remember.

7  Q.  Okay, but you do recall that he was tased; correct,

8  at some point?

9  A.  Yes.

10  Q.  Do you recall how many times he was tased?

11  A.  Twice.

12  Q.  Do you recall what officers tased him?

13  A.  No, sir.

14  Q.  Do you recall whether the tasing was ineffective?

15  A.  No, sir.

16  Q.  Do you recall whether it was effective?

17  A.  It wasn't effective because he was still wrestling.

18  Q.  After the two tases, then what happened?

19  A.  Okay, he wound up going over to the driver's side of

20  the door, car door.

21  Q.  Okay, and then what happens?

22  A.  Now, he is in the driver's side seat.  He scoots over

23  to the passenger side seat.

24  Q.  Okay, is it like one continuous movement from the

25  driver's side seat to the passenger side seat?

1  A.  I don't remember.

2  Q.  Was the door open when he got -- before he got into

3  the vehicle?  Before he even went around to the driver's

4  side, was the door open?

5  A.  I don't remember.

6  Q.  Okay, after he gets into the passenger seat, do you

7  recall going around to the passenger side door?

8  A.  Yes.

9  Q.  Do you recall that the plan was at least between you

10  and your trainee Officer Rice was that you were going to

11  open the door, and she was going to tase him on the

12  passenger side?

13  A.  We had no plan that I can remember about that.

14  Q.  Now, when you are at the passenger door, first of

15  all, did you try to open the door?

16  A.  Yes, sir.

17  Q.  Was it locked?

18  A.  I am assuming so.

19  Q.  Do you remember?

20  A.  I could not open it.  I am assumed it was locked.

21  Q.  Are you looking inside on the passenger side window?

22  A.  I glanced inside.  I didn't just look.

23  Q.  And did you -- could you see his hands?

24  A.  I don't remember seeing his hands at that point.

25  Q.  Did you see him make any strange movements while you

1   were at the passenger side door?

2   A.   No, sir.

3   Q.   Then you move around to the driver's side door to try

4   to find a button to unlock the passenger side door?

5   A.   Yes, sir.

6   Q.   When you go around to the driver's side door, where

7   are you located?

8   A.   When I get to the driver's side door?

9   Q.   Yes.

10  A.   Okay, I push the door open or opened it.  I don't

11  remember if it was, and the door is to my left, and I am

12  standing here at the door opening, so I am in that area

13  right there.

14  Q.   Okay, so it is your memory when you went around to

15  the driver's side door to look for the unlock button.

16  Were there any officers on -- other officers on the

17  driver's side?

18  A.   I remember there was someone there at least one.

19  Q.   Do you recall where they were located?

20  A.   Generally, just there.  I mean, not exactly.  I don't

21  remember.

22  Q.   So you don't remember if the door was fully open and

23  whether someone was standing at the door?

24  A.   No, sir.

25  Q.   With it being fully open?

1  A.  No.

2  Q.  Do you recall Officer Terry being on the driver's

3  side door?

4  A.  My memory is playing tricks.  No.

5        MR. MARKS: Your Honor, at this time, we are

6  going to offer Plaintiff's Exhibit Nos. 62 and 65.

7        THE COURT: 62 has already been admitted, so 65.

8  Is there any objection to Plaintiff's Exhibit No. 65?

9        MR. BRANDT: No, Your Honor.

10        THE COURT: Plaintiff's Exhibit No. 65 is

11  admitted into evidence.

12        MR. MARKS: Thank you, Your Honor.  We would

13  publish 62 if we could.  No, let's go to 65.  I am sorry.

14  Q.  (BY MR. MARKS) All right, now, when you go from the

15  passenger side around to the driver's side, first of all,

16  do you recall which direction you took whether you went

17  around the front?

18  A.  We walked around the front, sir.

19  Q.  And then -- and you don't recall whether the door was

20  this open or not?

21  A.  No, sir.

22  Q.  Okay, when you get to the driver's side door, do you

23  recall actually opening the door wider?

24  A.  No.

25  Q.  Okay, you said you believe someone was standing close

1 to the door?

2 A.  Yes.

3 Q.  You don't recall who it was?

4 A.  No, sir.

5 Q.  Just kind of, if you can, and I think you can use

6 your finger, just kind of draw an oval as to where that

7 person was located when you came back around.

8 A.  What?  The other officer?

9 Q.  Yes.

10 A.  I can't pinpoint him exactly, just in the general

11 area.

12 Q.  I understand.  That's all I am asking.

13 A.  Maybe there (indicating).

14 Q.  Okay, so is your memory that he was by the B pillar

15 on the driver's side?

16       MR. BRANDT: Objection, Your Honor.  He said he

17 did not remember.

18       THE COURT: Wait just a minute.  I thought

19 previously he asked him to draw an oval on that exhibit

20 as to where that other officer was standing.  He has done

21 that.  So what is this objection?

22       MR. BRANDT: He said he doesn't remember where

23 the officer was.  Then he was asked to draw an oval, and

24 so he drew an oval of an approximation, but he -- but the

25 fundamental thing was he didn't remember where the

1  officer was.

2         THE COURT: He said do an approximation.  I will

3  let him follow up on that.  He did draw an oval on the

4  exhibit.  That's his best recollection, so I will let

5  Mr. Marks follow up on that question.

6         MR. MARKS: Thank you.

7         THE COURT: The objection is overruled.

8         MR. MARKS: Thank you, Your Honor.

9  Q.  (BY MR. MARKS) Understanding you don't remember

10  exactly where he was, but you have a general idea where

11  he was and that general idea, was he near the B pillar?

12  A.  He was near, yes; he was near.

13  Q.  Did that officer have his gun drawn?

14  A.  I don't remember.  I don't remember.

15  Q.  Now, tell us when you got to the driver's side door

16  then did you -- let's do this.  Kind of show us where you

17  were?  By the way, were you standing or kneeling when you

18  were at the driver's side door?

19  A.  Standing, but kind of hunched over so I could see.  I

20  wasn't standing straight.

21  Q.  So you were standing up and hunched over looking for

22  a button?

23  A.  Yes, sir.

24  Q.  Sort of like this (indicating)?

25  A.  Yes, sir.

1 Q.  And kind of give us an approximation by using a

2 circle as to where you were located?

3 A.  (Indicating).

4 Q.  All right, so you are pretty much in the V of the

5 door and the frame?

6 A.  Yes, sir.

7 Q.  And do you feel officers to the right of you?

8 A.  Yes, I feel their presence.

9 Q.  At some point in time, and by the way as you are

10 looking down, you are not looking at Mr. Davis on the

11 passenger side vehicle?

12 A.  I am alternating looking down and up.

13 Q.  Okay, at some point in time, does -- do you feel like

14 the officer who was immediately to your right had left

15 you?

16 A.  First, I was pushed, and then I felt the absence of

17 presence.

18 Q.  And when you felt the absence of the presence of an

19 officer to your right, is that when you began fearing for

20 your safety?

21 A.  I was scared stiff at that point.

22 Q.  So before you saw any actions taken by Mr. Davis, you

23 were fearful because what you had felt previous had left?

24 A.  Yes.

25 Q.  So your fear was being alone as opposed to any

1   actions Mr. Davis had taken at that time?

2   A.  The fear was I was being warned, and I didn't

3   understand why I was being warned.

4   Q.  Was this a verbal warning?

5   A.  No, I interpreted the push on my arm as a warning and

6   it scared me, and it frightened me.  I did not know why I

7   had to be careful, more careful or afraid, not noticing

8   what scared me.  That is why I took another look, close.

9   Q.  All right, now, then you look up?

10  A.  Yes.

11  Q.  To see what's going on?

12  A.  Yes.

13  Q.  And then do you see him -- Mr. Davis make movement at

14  that time?

15  A.  When I looked up, he had his hands placed on the seat

16  pretty much like I am standing -- sitting here exactly.

17  This is what I remember.

18  Q.  Okay, all right, so his -- both hands?

19  A.  Both hands.

20  Q.  Both hands were on his seat?

21  A.  On his seat.

22  Q.  And are they between his legs?

23  A.  Between his legs.

24  Q.  That is what you remember seeing?

25  A.  Absolutely.

1   Q.   And that is when the shots are fired?

2   A.   No.

3   Q.   When are the shots fired?

4   A.   He made several movements, and shots are fired

5   shortly after.

6   Q.   What movements did he make?

7   A.   I remember when I first looked up scared that he had

8   his hands here.  The movement he made was he brought his

9   hands up like so, okay.

10   Q.   Okay.

11   A.   He brought his hands back down to the seat.  That is

12   when I became more than scared.  I became terrified.  I

13   was very afraid at that point.   My mind is screaming at

14   me.  He does this again, a second time.  My mind is

15   screaming at me.  He comes back down again.  All I hear

16   is my voice.  He comes up a third time.  At this third

17   time, he begins a slight downward motion, and I hear in

18   my memory a soft gentle pop, and then he starts jerking.

19   I realize he has been shot.

20   Q.   All right, so during these movements, you are able to

21   see his hands?

22   A.   Yes.

23   Q.   At all times?

24   A.   He brought them up, yes.

25   Q.   You are able to see his hands -- you are able to see

```
 1  his hands were against the seat?
 2  A.  Yes, sir.
 3  Q.  When he brought them up, you were able to see his
 4  hands?
 5  A.  Yes, sir.
 6  Q.  When he went down, you are still able to see his
 7  hands?
 8  A.  Yes, sir.
 9  Q.  When he brought them up, you were still able to see
10  his hands; right?
11  A.  Yes, sir.
12  Q.  And then when he started going back down, that is
13  when the shots occurred.
14  A.  That is when I hear the little pop.  I think that is
15  this shot.
16  Q.  So it is twice, hands up here, hands here, hands up
17  here, and as he going back down and he is shot?
18  A.  Hands up three times.
19  Q.  Three times?
20  A.  After the third time is when I hear a pop.
21  Q.  All right, and in all this movement of the hands and
22  you have a pretty good view of his hands right because
23  you are right there in the door; true?
24  A.  Yes, sir.
25  Q.  You have a clear view of his hands; right?
```

1   A.   I do.

2   Q.   You never saw a gun in his hands, did you?

3   A.   No, sir.

4   Q.   Do you recall anyone saying that, "gun, gun," or

5   "gun, gun, gun," or anything to that effect?

6   A.   At the scene, no.

7   Q.   Before the shots?

8   A.   No.

9   Q.   Now, after the shots are fired as a police officer,

10   are you trained that one of the first things you need to

11   do is secure any weapon that the suspect may have?

12   A.   We prefer -- we don't touch anything.  If you have to

13   secure the weapon for safety reasons, we have to do that.

14   Q.   Sure, and if a suspect had a gun and was using it or

15   was threatening to use it, then one of the things an

16   officer would want to do would be to secure the weapon;

17   right?

18   A.   Okay, I didn't see a gun, so --

19   Q.   Fair enough.  I will move on.  But you did -- by the

20   way, after the pop, you said he started jiggling?

21   A.   Yes, sir.

22   Q.   Like he was in shock?

23   A.   I don't know if it was shock or not.  He was

24   responding to the shot.

25   Q.   Was it more than one shot?  Do you recall there being

1  more than one shot?

2  A.   Sir, in my mind I only hear one pop.

3  Q.   Fair enough.  I am just trying to understand what you

4  recall, okay.  Did you go around to the passenger side to

5  check on the victim at that point in time?

6  A.   Yes, sir.

7  Q.   Did you open the passenger door at that point in

8  time?

9  A.   Yes, sir.

10  Q.   And by the way --

11             MR. MARKS: You can pull that exhibit.  I am

12  sorry.

13  Q.   (BY MR. MARKS) Was the suspect still conscious when

14  you saw him?

15  A.   His eyes were closing for the final time when I saw

16  him.  I don't know if he was conscious or not.  He let

17  out his last breath there in front of me.  I am assuming

18  at that point he is dead.  I am not a doctor.  I don't

19  know.

20  Q.   Sure.  I am asking from your perspective, did he

21  appear to lose consciousness in front of you?

22  A.   Oh, yes, in front of me, yes.

23  Q.   Now, did you grab his hand at any point in time?

24  A.   Grab is a strong word.  I did get it gently.  I was

25  afraid.  I didn't grab.

1  Q.  Why were you afraid?

2  A.  Even though to me he was dead and dying, and as I

3  came around and I reached in to grab in because I knew he

4  had to be helped, as I reached in, the fear returned, and

5  I was terrified, and I know it sounds ridiculous.  I was

6  thinking perhaps he was asleep, and if I grabbed him too

7  hard, he would be startled and the fight would begin all

8  over again.  I moved in gently and touched his wrist.

9  Q.  Were you feeling for a pulse?

10  A.  I was just feeling.  I felt nothing.  I don't know if

11  I didn't feel a pulse or not.  I went to gently grab to

12  see what I would have to do in order to secure him.

13  Q.  Now, when you went over to the passenger side, was

14  your intent to try to pull him out of the passenger side?

15  A.  To help, and I hadn't formulated a plan.  It was

16  touch and go.  It was fluid.  It was happening fast.  I

17  knew I had to do something.  I had to determine, so the

18  determination was made to help somehow.  What exactly, I

19  didn't know at that point.

20  Q.  All right, now, did you -- when you opened the door

21  and lightly touched his right hand -- are you okay?

22  A.  Sir?

23  Q.  I am sorry.  Never mind.  I thought you were getting

24  emotional.  When you went around to the passenger side

25  and put your hand on his right arm, did you scan the area

1   to see if you could see any weapons?

2   A.   Oh, yes, I was still scared.   I scanned.

3   Q.   And did you see any weapons?

4   A.   No, sir.

5   Q.   All right, at that point in time you see him lose

6   consciousness?

7   A.   I believe I did, yes.

8   Q.   I think you said "take his last breath," at least

9   that was your perception?

10   A.   Yes, he let out his last breath.

11   Q.   You knew it was going to take more than just you to

12   get him out of the vehicle?

13   A.   Yes, sir.

14   Q.   Did you suffer any injuries during this encounter?

15   A.   No, sir.

16   Q.   Did you get any blood on you during this encounter?

17   A.   I don't remember.

18         MR. MARKS: Your Honor, at this time we would

19   offer Plaintiff's Exhibit No. 143.

20         THE COURT: Any objection to Plaintiff's Exhibit

21   No. 143?

22         MR. BRANDT: No objection.

23         THE COURT: Plaintiff's Exhibit No. 143 is

24   admitted into evidence.

25         MR. MARKS:  Can you pull up Plaintiff's Exhibit

1   No. 143.

2   Q.  (BY MR. MARKS) Is Exhibit No. 143 a picture taken of

3   you?

4   A.  Yes.

5   Q.  Do you recall the time frame as to the incident

6   happening and when this picture was taken?

7   A.  Many minutes.  It wasn't right away.

8   Q.  Are we talking minutes and not hours?

9   A.  It could have been hours.

10  Q.  But it certainly wasn't the next day?

11  A.  No, sir.

12  Q.  It was the same day?

13  A.  Yes, sir.

14  Q.  And do you see any blood on you in this picture?

15  A.  I don't make out any blood.

16      MR. MARKS:  Your Honor, just a brief moment for

17  me to talk with my co-counsel.

18      THE COURT: All right, you may.

19      (PAUSE IN PROCEEDINGS.)

20  Q.  (BY MR. MARKS) Officer Flores, when you are scanning

21  the area, did you ever see a drawer pulled out from

22  underneath the passenger seat?

23  A.  No, sir.

24      MR. MARKS: Exhibit No. 149, please.

25      THE COURT: Exhibit No. 149 is in evidence.

1    MR. MARKS: Your Honor, at this time please show

2  the witness 149.

3  Q.  (BY MR. MARKS) All right, do you see that compartment

4  door open?

5  A.  Yes, sir, I do.

6  Q.  And when you went to check on Mr. Davis and you

7  scanned the area, do you believe that you would have seen

8  that compartment open if, in fact, it was open?

9  A.  I don't remember seeing it open, sir.

10  Q.  Yes, sir, my question is a little different?

11  A.  Yes.

12  Q.  I understand you don't remember seeing it open.  My

13  question is do you believe you would have seen it if it

14  was open?

15  A.  I believe, yes.

16  Q.  All right, thank you.

17    MR. MARKS: Pass the witness.

18    THE COURT: Thank you, Mr. Marks.

19    Cross-examination, Mr. Brandt.

20    MR. BRANDT: Yes, Your Honor.

21    C R O S S   E X A M I N A T I O N

22  Q.  (BY MR. BRANDT) Officer Flores, you answered some

23  questions from Mr. Marks, and you said "I feared imminent

24  bodily injury or death."  When did you feel that?

25  A.  When I was there looking down at the door to find the

1  button, that is when I felt the arm pushing me here.  It
2  was a gentle push.  I wasn't looking, but I interpreted
3  that as a warning.  At that point I get scared; what am I
4  being warned about?  I look up, and that's when I see
5  Mr. Davis with his hands here, pretty much like I am
6  doing right here.  I am still scared at that point.  He
7  brings his hands up.  My mind is screaming at me.
8  Q.   What is your mind screaming at me?
9  A.   Screaming loudly.
10 Q.   What's that?
11 A.   It's screaming loudly.  Do you want me to just say
12 it?
13 Q.   Yes.
14 A.   Man, okay, he starts here, he comes up here
15 (indicating with hands).  My mind is going, what's he
16 doing?  He comes back down here (indicating with hands),
17 and my mind is screaming at me, what's he reaching for?
18 He comes up here again (indicating with hands), and I'm
19 thinking, what's he doing?  He is surrounded by cops with
20 guns.  He comes back down (indicating with hands).  He is
21 not being reasonable.  I am going to have to kill him.
22 He comes back up here that third time, and when his hands
23 begin to come back down (indicating with hands), that is
24 when I hear the pop.  I was terrified, not just scared,
25 because he was reaching down.  He wasn't just tapping his

1   seat.  He was reaching.  I wasn't just scared.  I was

2   scared at first, and I was terrified when I realized he

3   was coming down like this (indicating with hands).

4   That's when I was terrified.

5   Q.  That was what was going through your mind.  What was

6   your body doing at that moment?  Any movement?

7   A.  I was reaching for my gun.  I wanted to get my gun

8   out.  I wanted to shoot him.  I was scared stiff.

9   Q.  Were you able to get your hand to your gun quickly?

10   A.  Sir, I couldn't get to my gun fast enough.  It was

11   like slow motion.  It was like slow motion.  I could just

12   feel my hand not going fast enough, and I am almost there

13   when I hear the pop.

14   Q.  Had it not been for that pop, would you have shot

15   Mr. Davis?

16   A.  If he had come out with a gun, yes.  I was coming out

17   in preparation to shoot him, yes.

18   Q.  You were reaching for your gun to shoot him?

19   A.  Oh, yes, when he went down like that, I was

20   determined to protect myself.

21   Q.  Did you think that you were justified in shooting him

22   at that point?

23   A.  At that point, no I would have to wait for a gun to

24   come out.

25   Q.  Now, you said your memory was playing tricks on you.

1  A.   Yes.

2  Q.   What do you mean by that?

3  A.   I am looking at one thing, I'm looking at the door

4  here.  I see myself all the time looking for buttons to

5  push to unlock that passenger side door, so I am looking

6  for buttons to push to unlock that passenger side door.

7  I look up, and he just sitting there.  I come back, and I

8  am still looking for buttons to push because there are

9  several buttons here to push.  I look up again.  I don't

10 know how many times I do this.  The reason I say I think

11 my mind is playing tricks on me is because later at one

12 point I was shown a picture of that car door, and there

13 are no buttons on that car door.  But in my mind even

14 right here today that thing is stinking real.  I see

15 multiple buttons there, and I am playing with them trying

16 to find which one unlocks that door.  I know I don't

17 remember things because of the picture that was shown to

18 me.  I am like, oh, my goodness, there are no buttons

19 there to push.  In my mind, I lay awake in bed at night,

20 and I see buttons still.  Sorry.

21 Q.   You described your memory as fuzzy; is that correct?

22 A.   Yes, sir.

23 Q.   Would you say that is generally your memory of this

24 event is fuzzy?

25 A.   Yes, sir.

1          MR. BRANDT: No further questions.

2          THE COURT: Thank you, Mr. Brandt.

3       Redirect, Mr. Marks.

4          MR. MARKS: Thank you, Your Honor.

5          R E D I R E C T   E X A M I N A T I O N

6   Q.  (BY MR. MARKS) You would not have shot Mr. Davis

7   unless you saw him with a gun or another weapon?

8   A.  I don't believe so, sir.

9   Q.  No, sir, meaning that is correct?

10  A.  That is correct, sir.

11         MR. MARKS: Thank you, Officer.  Pass the

12  witness.

13         THE COURT: Thank you, Mr. Marks.

14      Recross, Mr. Brandt.

15         MR. BRANDT: Nothing further.

16         THE COURT: All right, can this officer be

17  excused?

18         MR. MARKS: Yes, Your Honor, the officer may be

19  excused.

20         THE COURT: All right, sir, you may step down.

21  You are excused.

22         (WITNESS EXCUSED.)

23

24

25

Charyse C. Crawford, CSR, RPR
1100 Commerce, Room 1544, Dallas, Texas 75242
(214)753-2373 Telephone
Charyse_Crawford@txnd.uscourts.gov or charysecrawford@gmail.com

1     *I certify that the foregoing is a correct transcript*
*from the record of proceedings in the above-entitled*
2 *matter.  I further certify that the transcript fees*
*format comply with those prescribed by the court and the*
3 *Judicial Conference of the United States.*

4     *S/Charyse C. Crawford*       *03-04-2022*
Signature_____ Date:_____
5     Charyse C. Crawford, CSR, RPR
    United States Court Reporter
6     Northern District of Texas - Dallas Division

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25