IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **OTIS DAVIS, SR.,** Individually; **DOROTHY O. JACKSON,** Individually; **and LASANDA TRAVIS-DAVIS,** Individually and as the Administrator of the Estate of Decedent, Bertrand Syjuan Davis, <br><br>Plaintiffs, <br><br>v. <br><br>**MATTHEW TERRY,** <br><br>Defendant. | § § § § § § § § § § § § § § § | <br><br><br><br><br><br><br><br>Civil Action No. **3:16-CV-2548-L** |

## MEMORANDUM OPINION AND ORDER

Before the court is Plaintiffs' Rule 59 Motion for New Trial ("Motion") (Doc. 183), filed April 11, 2022. After careful consideration of the Motion, Defendant Matthew Terry's Response to Plaintiff's Rule 59 Motion for New Trial ("Response"), relevant trial testimony and exhibits, and applicable law, the court **denies** the Motion.[1] The court apologizes for the delay in issuing this opinion. When the facts asserted by Plaintiffs in their Motion did not square with the court's copious notes taken during the trial, it ordered the court reporter to transcribe selected portions of key testimony relied upon by Plaintiffs to compare it with the court's notes. A detailed review of the trial testimony reveals that Plaintiffs misstate witness testimony and take it out of context. Moreover, the witnesses that Plaintiffs use to support their Motion were not in a position to see whether Mr. Davis had possession of a gun at the time he was shot.

---

[1] Plaintiffs did not file a reply to Defendant's Response.

**Memorandum Opinion and Order – Page 1**

I.  **Background**

Otis Davis, Sr., individually; Dorothy Jackson, individually; and LaSanda Travis-Davis; individually and as the administrator of the Estate of Decedent, Bertrand Syjuan Davis ("Mr. Davis" or "Decedent"), (collectively, "Plaintiffs") filed this action against the City of Dallas ("the City") and Matthew Terry ("Sergeant Terry"[2] "or "Defendant Terry") on September 5, 2016. Plaintiffs sued the City and Officer Terry for his alleged use of excessive—nonlethal deadly force and deadly force—that resulted in the shooting death of Mr. Davis on August 27, 2015. Plaintiffs brought this action pursuant to 42 U.S.C. § 1983 for alleged violations of the Fourth and Fourteenth Amendments to the United States Constitution, and they also asserted a number of state law claims against the City and Sergeant Terry. *See* Plaintiffs' Orig. Compl. 1-5 (Doc. 1). They later filed Plaintiffs' First Amended Complaint (Doc. 25) on June 6, 2017. The court granted Plaintiffs leave to file the amended pleading, and it did not materially change in substance from Plaintiffs' initial pleading. The only Defendant who proceeded to trial was Sergeant Terry.

This action was tried before a jury and the court from March 1-4, and 7-11, 2022. On March 11, 2022, the jury rendered its verdict in favor of Defendant Terry and against Plaintiffs Otis Davis, Sr., Dorothy O. Jackson, and Lasanda Travis-Davis, Individually, and as the Administrator of the Estate of Decedent, Bertrand Syjuan Davis.

In its answer to Question No. 1, the jury found that Plaintiffs did not prove by a preponderance of the evidence that Defendant Terry used excessive, nondeadly force on August 27, 2015, against Bertrand Syjuan Davis in violation of his constitutional rights. In accordance with the court's instructions, the jury proceeded to Question No. 4. In its answer to Question No. 4, the jury found that Plaintiffs did not prove by a preponderance of the evidence that Defendant

---

[2] Since the incident made the basis of this action, Defendant Terry has been promoted to the rank of Sergeant.

**Memorandum Opinion and Order – Page 2**

Terry used excessive, deadly force on August 27, 2015, against Bertrand Davis in violation of his constitutional rights. Consistent with the court's instructions, the jury did not answer any further questions in the Court's Charge. Plaintiffs now request the court to set aside the jury's verdict and order a new trial.

## II. Motion for New Trial Standard

A court, upon motion, may "grant a new trial on all or some of the issues" to any party "after a jury trial, for any reason for which a new trial has heretofore been granted in an action at a law in federal court[.]" Fed. R. Civ. P. 59(a)(1)(A). New trials may be granted if a district court determines that the "verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Smith v. Transworld Drilling Co.,* 773 F.2d 610, 613 (5th Cir. 1985) (footnote and citations omitted). The appeals court reviews the denial of a motion for new trial for an abuse of discretion. A "district court abuses its discretion by denying a new trial 'only when there is an absolute absence of evidence to support the jury's verdict." *Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 881 (5th Cir. 2013) (citations omitted). If the evidence at trial is legally sufficient to support the jury's verdict, a district court does not abuse its discretion by denying a motion for new trial. *One Beacon Ins. Co. v. T. Wade Welch & Assocs.,* 841 F.3d 669, 676 (5th Cir. 2016) (citations omitted). The appeals court is to view the evidence "in the light most favorable to the jury verdict." *Wellogix*, 716 F.3d at 881 (citation omitted). A motion for new trial must clearly show that "a manifest error of law" occurred at the trial. *Simon v. United States*, 891 F.2d 1154, 1159 (5th Cir. 1991) (citation omitted). The moving party has the burden to demonstrate harmful error justifying a second trial. *Streber v. Hunter*, 221 F.3d 701, 736 (5th Cir. 2000). When a party challenges the jury verdict, the court has no obligation to grant a new trial unless it finds the evidence—viewed in the light most

favorable to the verdict—weighs so strongly and overwhelmingly in favor of one party that no reasonable person could arrive at a contrary conclusion. *Alaniz v. Zamora-Quezada*, 591 F.3d 761, 770 (5th Cir. 2009).

### III.   Arguments of the Parties

#### A.  Plaintiffs

Plaintiffs contend that the verdict of the jury in favor of Defendant Terry is "contrary to the great weight of the evidence." Pls.' Mot. 1. They also contend that the jury did not properly consider key evidence presented at trial, and, had it done so, a different verdict would have been rendered. For these reasons, they contend that the court must vacate the verdict and order a new trial.

#### B.  Defendant Terry

Defendant Terry disagrees with Plaintiffs' argument that the jury's verdict is contrary to the great weight of the evidence presented in this case. He makes a number of arguments, but his primary arguments are that the Plaintiffs are improperly trying to reassess the credibility of the witnesses, which is a matter exclusively reserved for members of the jury, and that the evidence presented at trial supports the verdict reached by the jury. All other arguments made by Sergeant Terry are subsumed in his principal arguments, and the court will analyze and discuss them as necessary.

### IV.   Discussion

#### A.  Portions of the Court's Jury Charge

During trial, in denying Defendant Terry's motion for judgment as a matter of law made pursuant to Federal Rule of Civil Procedure 50, the court stated that there were factual disputes that had to be decided by the jury, and that the case was the "classic" jury case. The court also

made clear that it would not interfere with the jury's deliberative process, and, depending on the verdict of the jury, the Rule 50 Motion could be addressed postverdict as necessary. The court now sets forth those portions of the Court's Charge that relate to the jury's roles to assess credibility of the trial witnesses and weigh the evidence presented at trial.

### Credibility and Number of Witnesses

You alone are to determine the questions of credibility or truthfulness of the witnesses, and the weight to be given to each person who testified. In weighing the testimony of the witnesses, you may consider the witness's manner and demeanor on the witness stand, any feelings or interest in the case, or any prejudice or bias about the case, that he or she may have, and the consistency or inconsistency of his or her testimony considered in the light of the circumstances. Has the witness been contradicted by other credible evidence? Has he or she made statements at other times and places contrary to those made here on the witness stand? You must give the testimony of each witness the credibility that you think it deserves.

Even though a witness may be a party to the action and therefore interested in its outcome, the testimony may be accepted if it is not contradicted by direct evidence or by any inference that may be drawn from the evidence, if you believe the testimony of such witness.

You are not to decide this case by counting the number of witnesses who have testified on the opposing sides. Witness testimony is weighed; witnesses are not counted. The test is not the relative number of witnesses, but the relative convincing force of the evidence. The testimony of a single witness is sufficient to prove any fact, even if a greater number of witnesses testified to the contrary, if after considering all of the other evidence, you believe that particular, witness. A witness may be discredited or "impeached" by contradictory evidence, by a showing that he or she testified falsely concerning a material matter, or by evidence that at some other time the witness said or did something, or failed to say or do something, which is inconsistent with the present testimony of that witness. If you believe that any witness has been impeached, it is your exclusive province to give the testimony of that witness such credibility or weight, if any, as you think it deserves. You should keep in mind, of course, that a simple mistake by a witness does not necessarily mean that such witness was not telling the truth as he or she remembers it, because people may forget things or remember other things inaccurately with the passage of time; therefore, if a witness has made a misstatement, you need only consider whether that misstatement was an intentional falsehood or simply an innocent lapse of memory; and the importance of that may depend on whether it has to do with an important factor or with only an unimportant detail.

**Memorandum Opinion and Order – Page 5**

**Evidence and Inferences**

Generally speaking, there are two types of evidence that a jury may consider in properly finding the truth as to the facts in this case. One is direct evidence- such as the testimony of an eyewitness. The other is indirect or circumstantial evidence-the proof of a chain of circumstances that point to the existence or nonexistence of ce1tain facts. As a general rule, the law makes no distinction between direct and circumstantial evidence but simply requires that the jury find the facts from the evidence, both direct and circumstantial.

While you must consider only the evidence in this case, you are permitted to draw reasonable inferences and deductions from the evidence. The expression "to draw an inference" means to find that a fact exists based on proof of another fact. An inference may be drawn only if it is reasonable and logical, not if it is speculative. Therefore, in deciding whether to draw an inference, you must consider all the facts in the light of reason, common sense, and experience. After you have done that, the question whether to draw a particular inference is for you to decide.

**Opinion Witnesses**

During the course of trial, you heard the testimony of Dr. Stephanie Burton, M.D, Dr. John Peters, Ph.D., and Mr. Steven Ashley, who all expressed opinions regarding several matters. Dr. Burton expressed opinions regarding Bertrand Davis's autopsy report; Dr. Peters expressed opinions regarding police practices and procedures as they relate to nondeadly and deadly force; and Mr. Ashley expressed opinions regarding police practices and procedures as they relate to deadly force. When knowledge of technical subject matter may be helpful to the jury, a person who has special training, knowledge, skill, education, or experience in that technical field is permitted to state his or her opinion on those technical matters.

That witnesses have expressed opinions does not mean, however, that you must accept their opinions. You are to judge their testimony like that of any other witness. As with any other witness, it is up to you to decide whether to rely on it. You may accept it or reject it, and give it as much weight as you think it deserves, considering the witness's education and experience, the soundness of the reasons given for the opinion, and all other evidence in the case. In deciding whether to accept or rely upon the testimony of any opinion witness, you may consider any bias of the witness, including any bias you may infer from evidence that t they have been or will be paid for reviewing the case and testifying, or from evidence that they testify regularly as an opinion witness or their income from such testimony represents a significant portion of their income.

**Memorandum Opinion and Order – Page 6**

### Law Enforcement Witnesses

> That a particular witness is law enforcement officer does not entitle his or her testimony to special consideration or any greater weight because of his or her status as a law enforcement officer. Such witnesses are to be treated as any other witness. Likewise, that a witness is a law enforcement officer does not entitle his or her testimony to any less consideration or less weight because of his or her status as a law enforcement officer.

Court's Charge 3-6.

**B. Analysis**

    1. *Deadly Force*

In support of their Motion, Plaintiffs take many facts out of context, omit key evidence presented to the jury, and selectively recall the evidence. Rather than discuss each piece of evidence, the court will discuss only that evidence necessary to show why the verdict was one that could be reached by a reasonable jury.

The essence of Plaintiffs' argument with respect to the use of deadly force by Defendant Terry is that the majority of witnesses never saw a gun in Mr. Davis's hand. This argument is a red herring, as only a few witnesses were in a position to see Mr. Davis's hands at the time Defendant Terry fired his weapon and shot him.

According to Plaintiffs, Mrs. Davis testified that Mr. Davis did not have any weapons; that Mr. Davis could not have gripped one because of a cut he suffered earlier that day and because of the shirt or towel that she applied as a compress to stop the bleeding; and that she had a view of Mr. Davis's hands at the time he was shot. The evidence, however, establishes that Mrs. Davis could not see Mr. Davis's hands when he was shot. This is so because the dash camera in Officer Rachael Rice's patrol car clearly shows that Mrs. Davis was being led away from the vehicle to a tree by Officer Rice for her safety, and she was not facing the vehicle when the shots were fired.

Plaintiffs state that Officer Brian Joseph ordered Mr. Davis to empty his pockets and the officer "never saw a gun." This statement, which the court takes as true, does not tell the whole story. Mr. Davis was not in a vehicle at the time Officer Joseph ordered him to "empty his pockets." What is conspicuously absent from Officer Joseph's testimony is what he observed when the shots were fired or whether he could see Mr. Davis's hands at that time. Officer Joseph never testified that he was in a position to see whether Mr. Davis had a gun in his hand at the time the shots were fired.

Plaintiffs argue that Officer Rice was never told by the Dallas Police Department's dispatcher that Mr. Davis had a gun, that she never saw Mr. Davis reaching for a gun, and that "she was standing right next to Mr. Davis outside the passenger door of the vehicle shortly before Davis was shot." Pls.' Mot. 6. The word "shortly" is relative. Was it several seconds, 30 seconds, a minute, or longer? This argument by Plaintiffs is misleading, if not downright deceptive. As previously noted, Officer Rice led Mrs. Davis away from the vehicle to a tree, and neither she nor Mrs. Davis could see whether Mr. Davis had a gun in his possession at the time of the shooting. The reason, as stated by the court, that Officer Rice did not see the shooting or observe all that Mr. Davis did or could have done is because she was leading Mrs. Davis away from the scene for her safety because of a fast-moving, volatile police incident. Further, that the police dispatcher never told Officer Rice that Mr. Davis had a gun is inapposite, as the dispatcher may have not had any knowledge of his possession of a weapon. Even if the dispatcher failed to convey such information to the officers in the field, such failure is not outcome-determinative. What counts are the facts and circumstances known to the officer at the time he or she decides to use nondeadly or deadly force.

Plaintiffs also argue that Senior Corporal Lucas Flores, Officer Rice's field training officer, was in the best position to see what Mr. Davis was doing when Defendant Terry shot him, because he was looking directly at Mr. Davis. Plaintiffs further argue that Senior Flores never saw Mr. Davis with a gun and never drew his firearm. Once again, Plaintiffs' account does not tell the whole story. On cross-examination, Senior Corporal Flores gives a more detailed account of what took place immediately before the shots were fired. He testified that he was "terrified" by Mr. Davis's actions immediately prior to the shooting. Rather than paraphrasing Senior Corporal Flores's testimony, the court sets forth the answers he provided to questions asked by Mr. Brandt, one of Sergeant Terry's attorneys:

> Q.   (By Mr. Brandt) Officer Flores, you answered some questions from Mr. Marks, and you said[,] "I feared imminent bodily injury or death." When did you feel that?
>
> A.   When I was there looking down at the door to find the button, that is when I felt the arm pushing me here. It was a gentle push. I wasn't looking, but I interpreted that as a warning. At that point I get scared; what am I being warned about? I look up, and that's when I see Mr. Davis with his hands here, pretty much like I am doing right here. I am still scared at that point. He brings his hands up. My mind is screaming at me.
>
> Q.   What is your mind screaming at me?
>
> A.   Screaming loudly.
>
> Q.   What's that?
>
> A.   It's screaming loudly. Do you want me to just say it?
>
> Q.   Yes.
>
> A.   Man, okay, he starts here, he comes up here (indicating with hands). My mind is going, what's he doing? He comes back down here (indicating with hands), and my mind is screaming at me, what's he reaching for? He comes up here again (indicating with hands), and I'm thinking, what's he doing? He is surrounded by cops with guns. He comes back down (indicating with hands). He is not being reasonable. I am going to have to kill him. He comes back up here that third time, and when his hands begin to come back

**Memorandum Opinion and Order – Page  9**

> down (indicating with hands), that is when I hear the pop. I was terrified, not just scared, because he was reaching down. He wasn't just tapping his seat. He was reaching. I wasn't just scared. I was scared at first, and I was terrified when I realized he was coming down like this (indicating with hands). That's when I was terrified.
>
> Q. That was what was going through your mind. What was your body doing at that moment? Any movement?
>
> A. I was reaching for my gun. I wanted to get my gun out. I wanted to shoot him. I was scared stiff.
>
> Q. Were you able to get your hand to your gun quickly?
>
> A. Sir, I couldn't get to my gun fast enough. It was like slow motion. It was like slow motion. I could just feel my hand not going fast enough, and I am almost there when I hear the pop.
>
> Q. Had it not been for that pop, would you have shot Mr. Davis?
>
> A. If he had come out with a gun, yes. I was coming out in preparation to shoot him, yes.
>
> Q. You were reaching for your gun to shoot him?
>
> A. Oh, yes, when he went down like that, I was determined to protect myself.
>
> Q. Did you think that you were justified in shooting him at that point?
>
> A. At that point, no I would have to wait for a gun to come out.

Excerpt of Flores's Test. (volume and page numbers of draft transcript not available).

The testimony of Senior Corporal Flores clearly shows that he was not just afraid, but terrified and "scared stiff" by the rapidly evolving events and Mr. Davis's conduct. He states that he was reaching for his gun, but it was like he was in "slow motion" when he heard the "pop," which was one of the shots fired by Defendant Terry. This testimony clearly allowed the jury to reasonably infer that Senior Corporal Flores "froze," which in common vernacular means that someone is momentarily incapable of acting or speaking because of fear, nervousness, a startling event, or stress. Society often hears of the "fight or flight" response, which is an automatic reaction

**Memorandum Opinion and Order – Page 10**

when one perceives an incident to be frightening or stressful; however, there is at least one other physiological response to such an incident, namely, the "freeze" response. By Senior Corporal Flores's own admission, this is what happened to him. Also, given his emotional and mental state of mind, his slow reaction, and a rapidly evolving police incident, the jury easily could have reasoned that there were events taking place that he did not observe, such as the gun. For example, Senior Corporal Flores heard only one "pop" (shot fired), while it is undisputed by Plaintiffs and Defendant that two shots were fired. That a person faced with a fearful or stressful situation does not recall, see, or hear all that is occurring is not uncommon, and the jury was free to exercise its discretion in considering Senior Corporal Flores's testimony, credibility, and demeanor.

While this was happening, Defendant Terry was standing in close proximity to Senior Corporal Flores, as was Officer Scott Neal. At some point while Senior Corporal Flores was in this described position, Officer Neal yelled "Gun!" before Defendant Terry fired any shots. He testified that he yelled "Gun!" three or four times, while his written account of the incident states that he yelled "Gun!" only once, which Plaintiffs' counsel pointed out during trial. Officer Joe King also stated that he heard someone say "gun" and then "a shot or two went off." Officer King could not see Mr. Davis's hands at the time Defendant Terry fired his weapon. Dallas Fire and Rescue Captain Matthew Shomer also testified that he heard the words "gun, gun" before any shots were fired. Further, Captain Shomer testified that he could not see what Mr. Davis was doing while he was inside the vehicle, which means that he was also not in a position to see whether Mr. Davis had a gun.

Senior Corporal Flores's statement or testimony that he did not shoot because he would have had "to wait for a gun to come out" is an incorrect statement of the law and quite beside the point. As stated in the Court's Charge:

**Memorandum Opinion and Order – Page 11**

> The use of deadly force is not unreasonable when an officer would have reason to believe that the suspect poses an immediate threat of serious bodily harm to the officer or others. A police officer is not required to be absolutely certain that a person is in possession of a gun at the time he or she decides to use deadly force; however, a law enforcement officer may not shoot a visibly unarmed person who poses no immediate threat to the officer or others. Police officers are not required to wait until a suspect shoots to confirm that an immediate threat of serious harm exists.

*Id.* at 10. Thus, as a matter of law, Senior Corporal Flores did not have to wait until he saw a gun in Mr. Davis's hand before firing his weapon if facts and circumstances existed that posed an immediate threat of serious harm to him or others. His incorrect statement of law does not affect the court's analysis regarding the use of deadly force.

Plaintiffs mention the testimony of Officer Rory Jones, a 37-year veteran of the Dallas Police Department, who testified that he holstered his gun after Mr. Davis was first tased by police officers. This statement has nothing to do with the shooting. Officer Jones holstered his gun because Mr. Davis was not an immediate threat to him or others when the officers were trying to detain Mr. Davis. Officer Jones's testimony in this regard is irrelevant with respect to the shooting and, once again, this is another example in which Plaintiffs take the facts out of context and attempt to mislead the court.

Plaintiffs also mention the testimony of Officer Joe King, a 25-year veteran of the Dallas Police Department. They argue that Officer King testified that he never saw Mr. Davis with a gun. This statement is true insofar as it goes; however, Officer King further testified that he could see the side of Mr. Davis's face but not his hands at the time the shots were fired, that Mr. Davis's head was turned toward the officers, and that he was screaming at them. Officer King further testified that he heard someone say "gun," and that shots were fired "[l]ike right after the word 'gun.'" The testimony of Officer King does not further Plaintiffs'

**Memorandum Opinion and Order – Page 12**

cause, as he was not in a position to see what Mr. Davis was doing with his hands or whether he had a firearm in one of his hands.

Plaintiffs present the testimony of two paramedics on the scene after the shooting and note that neither of them saw or found a gun when Mr. Davis was removed from the vehicle. This argument is another red herring. The primary concern of the paramedics was to tend to Mr. Davis's wounds and provide whatever medical aid they could to attempt to save his life. They were not there to search for weapons but to get Mr. Davis to a hospital to save his life if possible. Further, none of the paramedics or persons associated with Dallas Fire and Rescue Department was in a position to see the shooting, or what Mr. Davis had in his hands at that time.

Of particular importance is that a gun was found in a compartment in the vehicle underneath the seat on which Mr. Davis was sitting at the time he was shot. Moreover, the parties stipulated that "[t]he stains that were tested on the gun and on the magazine, which were noted on areas T1 and T2 of the Joint Exhibit[s] 1 and 2, were recovered from the vehicle and were confirmed to contain Bertrand Davis's DNA." Ct.'s Charge to the Jury 8 (Doc. 178). Further, both Officer Neal and Defendant Terry testified that they saw Mr. Davis in possession of a gun immediately before he was shot. The jury heard the testimony of both officers and assessed their credibility. Plaintiffs attempted to discredit both officers' testimony regarding the presence of a gun, but, based upon their testimony and the earlier-mentioned stipulation as to where the gun was found, the jury could reasonably conclude that Mr. Davis had a gun in his hand at the time he was shot. Plaintiffs only offer conjecture and speculation, which are not competent evidence. Because of this and other evidence and testimony, the jury could

reasonably find that Defendant Terry did not violate Mr. Davis's constitutional right to be free from the use of deadly force.

The court has examined the testimony of a number of fact witnesses and explained why a reasonable jury could have reached the decision that it did. Also crucial to the jury's decision was the testimony of Dr. Stephanie Burton, who performed the autopsy on Mr. Davis's body.

Doctor Burton testified regarding the two gunshot wounds that Mr. Davis suffered. According to her testimony, one bullet traveled and entered Mr. Davis's left arm, traveled through his left arm, and partially entered his left side. Regarding the second bullet, Dr. Burton testified that it entered Mr. Davis's left mid-back, struck the left lung, struck the pericardium, struck the heart three times—including the left atrium, atrium septum, right atrium—the pericardium again, the right lung, the diaphragm, right fifth rib, and partially exited at the right lateral chest. Dr. Burton testified that this bullet was the fatal shot. She also testified that, based upon her experience and training in forensic pathology, she could not determine which bullet first struck Mr. Davis. *See* Dr. Burton's Test. (volume and page numbers of draft transcript not available).

During the trial, Plaintiffs advanced the theory that Mr. Davis was shot in the back. Defendant Terry testified that he did not shoot Mr. Davis in the back. The point that the Plaintiffs attempt to make is that, because one bullet struck Mr. Davis on the left side in the middle of his back, he did not pose an immediate threat of serious bodily injury or death to Defendant Terry or others. Once again, given that the encounter was tense, fast-moving, and a volatile police incident; that Mr. Davis was not obeying the officers' commands; that a gun was observed by Defendant Terry and Officer Neal; that at least two persons, other than

**Memorandum Opinion and Order – Page 14**

Defendant Terry and Officer Neal, heard someone yell or say the word "gun" or "gun, gun," Defendant Terry was justified in using deadly force against Mr. Davis.

That one bullet struck Mr. Davis on the left side of his back is not a basis to overturn or set aside the jury verdict. We do not know which shot struck Mr. Davis first. If it were the shot to the left arm, it is certainly plausible that this shot caused his body to jerk, move, or twist, which would explain why the other shot struck him on the left side of the back.[3] Further, from the time Defendant Terry fired the first shot and it struck Mr. Davis, the jury could have plausibly believed that his movements caused the bullet to strike the left side of his back. The court sees no inconsistency in what the medical examiner said about the entrance of the bullets and how Defendant Terry, Senior Corporal Flores, Officer Neal, and Officer King described the incident and how Mr. Davis was positioned in the vehicle. From what the court can ascertain from the evidence, Mr. Davis's back was not fully facing Defendant Terry, and this is consistent with the testimony of all four officers. This was not a situation in which Mr. Davis's conduct posed no imminent threat of harm to the officers or others. Even if Mr. Davis's back were fully facing Defendant Terry, that did not eliminate the immediate threat of serious bodily harm or death to the officers, as an individual could easily turn his or her head toward an officer, slightly move the back to the left, fire a weapon over the left shoulder, and strike a person. A law enforcement officer's lot is not so hapless that he or she has to wait for a person to raise or aim a firearm before deadly force can be used.

The court makes one final observation regarding one of Plaintiffs' arguments and then it will move to use of the tasers against Mr. Davis. Plaintiffs argue that Mr. Davis was unable to grip a handgun and fire it because of a cut to his right hand received earlier in the day of

---

[3] Senior Corporal Flores testified that Mr. Davis "start[ed] jerking" after he heard the "soft, gently pop."

**Memorandum Opinion and Order – Page 15**

the shooting. The court recognizes that Mr. Davis received a cut to his right hand earlier and that at some or most of the time there was a cloth compress on the wound. This towel, cloth, or shirt did have a substantial amount of blood on it; however, other than argument, conjecture, and speculation, there is no competent evidence that Mr. Davis did not remove the compress, or establish that he was incapable of or unable to remove the compress, grip a gun, and attempt to aim and shoot. After all, the evidence showed, as will be discussed, that Mr. Davis had a high tolerance for pain, notwithstanding the wound to his hand, as the use of tasers had little to no effect on him.

### 2. *Nondeadly Force – Use of Tasers*

The court now focuses on the use of the tasers (nondeadly force) against Mr. Davis. Plaintiffs contend that Defendant Terry and Officer Neal, his partner, tased Mr. Davis at the same time, and Plaintiffs' experts, Dr. John Peters and Officer Hawkins, testified that tasing a person at the same time was excessive. Pls.' Mot. 1-2. This argument is not consistent with the evidence presented at trial.

First, the court cannot accept Plaintiffs' recollection of the testimony of Dr. Peters and Officer Hawkins. The essence of Officer Hawkins's testimony was that if Defendant Terry and Officer Neal planned or schemed to use their tasers at the same time against Mr. Davis, such use of the tasers would be improper; however, the court does not recall that any evidence was presented from which the jury could reasonably infer that Defendant Terry and Officer Neal intentionally planned or schemed to use their tasers against Mr. Davis at the same time. Thus, neither Officer Hawkins's testimony nor Dr. Peters's testimony supports Plaintiffs' theory that there was a plan by the two officers to taser Mr. Davis at the same time.

Further, as the evidence amply demonstrated at trial, the tasing of Mr. Davis by several officers did not accomplish the desired result because he continued to resist the officers who were lawfully attempting to detain him to determine whether a crime had been committed. "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (citation omitted). Mr. Davis was combative, resisted detention, fought with the officers, failed to comply with their commands, and engaged in conduct that required the use of nondeadly, and, ultimately, the use of deadly force.

With respect to deadly and nondeadly force, one element that Plaintiffs had to prove was that the injuries Mr. Davis received "resulted directly and only from Defendant Terry's use of force that was clearly excessive to the need." Court's Charge to the Jury 9. Given the evidence presented at trial, there was ample evidence from which the jury could reasonably conclude that the injury did not result "directly and only" from Sergeant Terry's use of force, or that force used by Sergeant Terry was "clearly excessive" to the need for him to use such force against Mr. Davis. In other words, the injuries that Mr. Davis suffered were the result of his failure to obey lawful orders and his violent behavior. The jury was well within its discretion to find that no constitutional violation occurred with respect to the use of deadly and nondeadly force by Defendant Terry.

## V.     Plaintiffs' Contingent Request for Hearing and Defendant's Argument Regarding Qualified Immunity

Plaintiffs have raised the issue of oral argument at a hearing, and Defendant Terry has asserted that the facts and law entitle him to a finding of qualified immunity. The court determines that oral argument is unnecessary in this case, as it would not assist the court in determining any issue of consequence. The court **denies** Plaintiffs' contingent request for a hearing and oral

argument. Likewise, the court determines that a finding of qualified immunity is unnecessary, as the jury returned a verdict in favor of Defendant Terry on the merits.

## VI. Conclusion

For the reasons herein set forth, the court **concludes** that Plaintiffs have not met their burden to show that the jury's verdict in favor of Defendant Terry was against the great weight of the evidence, or that the jury's verdict weighs so strongly and overwhelmingly in favor of Plaintiffs that no reasonable person could arrive at a contrary conclusion. Accordingly, the court **denies** Plaintiffs' Motion.

**It is so ordered** this 31st day of May, 2023.

Sam A. Lindsay
United States District Judge